**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| EMERGENCY PLANNING MANAGEMENT INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| THE UNITED STATES DEPARTMENT OF EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

Respectfully submitted,

**MATROSS EDWARDS LLC**

Dated:   July 16, 2019

/s/ *Joshua B. Duvall*_____
Joshua B. Duvall
Matross Edwards LLC
171 K Street NW, Suite 900
Washington, DC 20006
202.854.9959
jduvall@matrossedwards.com

*Attorney of Record for*
*Emergency Planning Management Inc.*

## TABLE OF CONTENTS

Table of Authorities……………………………………………………………………..… iii

I.      INTRODUCTION ............................................................................................. 1

II.     ISSUES PRESENTED...................................................................................... 2

III.    STATEMENT OF THE CASE........................................................................... 2

    A.    The Student Loan "Lifecycle" and ED's History of Contracting with PCAs.............. 3

    B.    ED's Inability to Procure Debt Collection Services Lead the Agency to Pursue the Next Generation Financial Services Environment by Excluding PCAs .................................. 5

    C.    The Solicitation ..................................................................................... 11

IV.     ARGUMENT ................................................................................................. 14

    A.    Jurisdiction, Standing And Standard Of Review ......................................... 14

        1.    The Court Has Jurisdiction Over This Matter.................................... 14

        2.    EPM Has Standing To File This Protest .......................................... 16

        3.    Legal Standards Concerning Agency Action Under APA...................... 18

        4.    Legal Standard Concerning Criteria For Injunctive Relief.................... 20

    B.    Plaintiff is Entitled to Injunctive Relief .................................................... 21

        1.    Plaintiff is Likely to Succeed on the Merits of The Counts Pled in the Complaint Because ED's Actions Constituted a Violation of Established Law, were Unduly Restrictive on Competition, were Lacking in the Procedure(s) Required by Law, were Arbitrary and Capricious, and Lacked any Rational Basis ............................................... 21

            a.    ED's Actions Constituted a Violation of Established Law, Including, but not Limited to, CICA and the FAR, and were Unduly Restrictive of Competition......... 21

            b.    ED's Conduct was Arbitrary and Capricious, Lacked any Rational Basis, and was an Abuse of Discretion ........................................................................ 27

        2.    EPM will be Irreparably Harmed if Injunctive Relief is Not Issued ...................... 28

        3.    No other Party Will Suffer Irreparable Harm if Injunctive Relief is Issued........... 30

        4.    Public Interest Favors the Issuance of an Injunction ............................................. 31

V.      CONCLUSION ...................................................................................................... 32

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Advanced Data Concepts, Inc. v. U.S.*, 216 F.3d 1054, 1057 (Fed. Cir. 2000) ........................... 18

*Amoco Prod. Co. v. Vill. Of Gambell*, 480 U.S. 531, 549 n.12, 107 S.Ct. 1396, 94 L.Ed.2d 542

   (1987) ........................................................................................................................ 19

*Automated Collection Servs. v. U.S.*, 133 Fed. Cl. 231, 233-34 (2017) ......................... 6

*Axiom Res. Mgmt., Inc. v. U.S.*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) ........................ 17

*Benchmade Knife Co. v. U.S.*, Fed. Cl. 731, 739 (2007) ............................................... 21

*CCL, Inc. v. U.S.*, 39 Fed. Cl. 780, 790 (1997) ............................................................... 16

*Ceres Envtl. Servs., Inc. v. U.S.*, 52 Fed. Cl. 23, 33 (2002) ....................................... 18, 29

*CHE Consulting, Inc. v. U.S.*, 125 Fed. Cl. 234, 245 (2016) ........................................ 21

*Cincom Sys. v. U.S.*, 37 Fed. Cl. 266, 269 (1997) ......................................................... 30

*Cont'l Serv. Grp., Inc., et al.*, B-416443.3, *et al.*, Nov. 19, 2018, 2018 CPD ¶ 393 ................... 10

*Cont'l Servs. Grp., Inc. v. U.S.*, 722 Fed. Appx. 986, 992 (Fed. Cir. 2018) ................................ 6

*Cont'l Servs. Grp., Inc. v. U.S.*, No. 17-449 *et al.*, Dkt. No. 183-2 ............................... 7

*CW Gov't Travel, Inc. v. U.S.*, 61 Fed. Cl. 559, 576 (2004) ........................................... 30

*Distributed Sols. v. U.S.*, 539 F.3d 1340, 1345 (Fed. Cir. 2008) ................................... 15

*Elec. Data Sys., LLC v. U.S.*, 93 Fed. Cl. 416 429 (Fed Cl. 2010) ................................ 18

*Fin. Asset Mgmt. Sys. Inc.*, B-490722.9, Apr. 24, 2015, 2015 CPD ¶ 145 ....................... 5

*FMC Corp. v. U.S.*, 3 F.3d 424, 427 (Fed. Cir. 1993) .................................................... 20

*FMS Inv. Corp. v. U.S.*, 136 Fed. Cl. 439 (2018) ......................................................... 7

*FMS Inv. Corp. v. U.S.*, 139 Fed. Cl. 221, 224 (2018) .................................................................. 8

*GC Servs. Ltd. P'ship*, B-416443, B-416443.2, Sept. 5, 2018, 2018 CPD ¶ 313 ....................... 10

*Gen. Revenue Corp.,* B-414220.2, *et al.*, Mar. 27, 2017, 2017 CPD ¶ 106 ................................. 6

*Glob. Comput. Enters., Inc. v. U.S.*, 88 Fed. Cl. 350, 418-19 (2009) ........................................ 16

*Google, Inc. v. U.S.*, 95 Fed. Cl. 661, 672 (2011) ........................................................... 15, 17, 19

*Impresa Construzioni Geom. Domenico Garufi v. U.S.*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) . 18

*Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, 660 F.3d 1293, 1295 (Fed.

   Cir. 2011) ....................................................................................................................... 19

*K-Lak Corp. v. U.S.*, 93 Fed. Cl. 749, 753-54 (2010) ........................................................... 14, 15

*Labatt Food Serv., Inc. v. U.S.*, 577 F.3d 1375, 1378 (Fed. Cir. 2009) ...................................... 16

*Magellan Corp. v. U.S.*, 27 Fed. Cl. 446 (1993) ................................................................... 20, 30

*Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 527 (2010) ........................... 14, 16

*Navient Sols., LLC v. U.S.*, 141 Fed. Cl. 181 (2018) ................................................................. 10

*Northstar Location Servs.*, B-409722.10, May 8, 2015, 2015 CPD ¶ 153 ................................... 5

*Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013) ................................ 16

*Pele v. Pa. Higher Educ. Assistance Agency*, 628 Fed. Appx. 870 (4th Cir. 2015) ..................... 9

*PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003) ......................................................... 30

*RAMCOR Servs. Grp., Inc. v. U.S.*, 185 F.3d 1286, 1289 (Fed. Cir. 1999) .............................. 15

*Rex Servs. Corp. v. U.S.*, 448 F.3d 135, 1308 n.1 (2006) ........................................................... 16

*TRW Envtl. Safety Sys., Inc. v. U.S.*, 16 Cl. Ct. 516 (1989) ...................................................... 20

*Tyler Constr. Grp. v. U.S.*, 570 F.3d 1329, 1335 (Fed. Cir. 2009) ............................................ 21

*United Int'l Investigative Servs., Inc., v. U.S.*, 41 Fed. Cl. 312, 323 (1998) .............................. 30

*Univ. Research Co. v. United States*, 65 Fed. Cl. 500, 515 (2005) ............................................. 31

*Washington Metro. Area Transit Auth. v. Holiday Inn.*, 559 F.2d 841 (D.C. Cir. 1972) ............ 20

*Weeks Marine, Inc. v. U.S.*, 79 Fed. Cl. 22, 37 (2007) ................................................................ 30

*Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009) ............................ 14

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) . 19

*Wis. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985) .................................................. 28

**Statutes**

15 U.S.C. § 1692a(6)(F) .............................................................................................................. 4

15 U.S.C. § 1692c(a) ................................................................................................................. 13

15 U.S.C. § 1692d .................................................................................................................... 13

15 U.S.C. § 644(e)(3) ............................................................................................................... 24

20 U.S.C. § 1018a(d)(2) ........................................................................................................... 11

28 U.S.C. § 1491(b)(1) .................................................................................................. 15, 16, 17

28 U.S.C. § 1491(b)(3) ............................................................................................................. 31

28 U.S.C. § 1491(b)(4) .................................................................................................. 19, 20, 28

31 U.S.C. § 3551(2)(A) ............................................................................................................. 17

31 U.S.C. § 3701 ......................................................................................................................... 4

31 U.S.C. § 3711(a)(1) .............................................................................................................. 27

31 U.S.C. § 3718(a) ................................................................................................................... 27

31 U.S.C. § 3718(d) ................................................................................................................ 5, 27

41 U.S.C. § 3301 ....................................................................................................................... 22

41 U.S.C. § 3304 ....................................................................................................................... 17

5 U.S.C. § 706 .............................................................................................. 19, 20, 28, 29

5 U.S.C. § 706(2)(A) ................................................................................................................. 20

**Regulations**

34 C.F.R. § 682.200(b) .................................................................................................. 3

48 C.F.R. § 19.502-3 .................................................................................................... 28

FAR § 10.001(c) ........................................................................................................... 23

FAR § 19.502-3(a) ................................................................................................. 15, 24

FAR § 2.101 .................................................................................................................. 21

FAR § 7.105 ........................................................................................................... 17, 21

FAR § 7.107-3 ............................................................................................................... 23

FAR § 7.107-4(b) .......................................................................................................... 22

FAR § 7.107-5 ............................................................................................................... 23

FAR § 8.401 .................................................................................................................. 21

FAR § 9.505-3 ............................................................................................................... 25

Plaintiff, Emergency Planning Management Inc. ("EPM"), by and through its undersigned attorney, respectfully submits this memorandum of law in support of its Application for Temporary Restraining Order, its Motion for Preliminary Injunction, and its Complaint, all filed concurrently herewith.

## I. INTRODUCTION

EPM—a Small Disadvantaged (Minority-Owned) and Service-Disabled, Veteran-Owned Small Business—brings this pre-award protest to ask this Court to set aside as unlawful a procurement under the U.S. Department of Education ("ED" or "Agency") Next Generation Processing and Servicing Environment ("NextGen") Business Process Operations Solicitation No. 91003119R0008 (the "Solicitation") attached hereto as <u>Exhibit A</u>. EPM is a Private Collection Agency ("PCA") seeking to provide private debt collection services as a prime contractor for defaulted student loans administered by ED under the Solicitation.

This is a protest concerning EPM's challenge of Defendant's decision, made through ED, to issue a solicitation which improperly and unjustifiably bundles the distinct requirements of student debt loan servicing and private debt collection services. Each of these requirements were historically performed separately and with respect to debt collection services there had always been both a small business and unrestricted pool. ED's unjustified bundling of services in the Solicitation suppresses small business prime contractor participation in ED procurements without due regard for the procedural steps required by the FAR, and constitutes irreparable harm to small business PCAs.

EPM now seeks review of ED's actions and its conduct in consolidating these distinct requirements under the Solicitation. Since ED did not pursue the procedural requirements for bundling loan servicing and collections services, the Solicitation should be set-aside as

inconsistent with the Small Business Act, 15 U.S.C. § 631 *et seq.*, the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3551, *et seq*, and the Federal Acquisition Regulation (the "FAR"). Further, the Solicitation's terms are inconsistent with federal law and Congressional mandates on the collection of government receivables. Thus, the Agency should be enjoined from making an award under the Solicitation until such time as the Agency carries out the mandatory bundling procedures and brings the terms of the procurement in line with federal statutes and regulation.

As such, this Court should set aside the Solicitation and enter injunctive relief in the form sought by Plaintiff in its Complaint, its Application for Temporary Restraining Order and its Motion for Preliminary Injunction.

## II.   ISSUES PRESENTED

Question:        Whether the actions of the Department of Education were in violation of the Competition in Contracting Act and the FAR, were arbitrary and capricious, were not in accordance with law, were lacking in observance of the procedures required by law, lacked a rational basis or were otherwise inappropriate and improper?

Suggested Answer:    *Yes.*

## III.   STATEMENT OF THE CASE

The underlying facts involved in this action are set forth at length in EPM's Complaint, filed concurrently herewith, and incorporated by reference as if set forth fully herein. For convenience of reference, EPM avers as follows:

## A. The Student Loan "Lifecycle" and ED's History of Contracting with PCAs

1.     ED's Office of Federal Student Aid ("FSA") is responsible for administering the Federal Direct Loan Program ("FDLP") which authorizes the agency to award and administer grants, work-study funds, and loans to student borrowers across the United States. The administration of the loans under FDLP, as well as the Federal Family Education Loan Program, includes several distinct functions throughout the "lifecycle" of the loan including, (a) application and eligibility determination, (b) disbursement, (c) loan processing and servicing, and (d) recovery. *See* FSA Next Generation Financial Services Environment Phase I Solicitation ("Phase I Solicitation") at 2, attached hereto as <u>Exhibit B</u>.

2.     The "loan processing and servicing" stage of this "lifecycle" involves, "customer service; loan counseling; billing and payment application and processing; repayment plan adjustments and application of benefits such as deferments, forbearance, or loan forgiveness/discharge; outreach and default aversion; quality control; and financial and other data reporting." The "recovery" stage, also referred to as "collections services," begins once a loan enters default. For most federal student loans—those repayable in monthly installments—default occurs where no payment is made on the loan for a period of at least 270 days. *See* 34 C.F.R. § 682.200(b). At this stage, the loan is referred from the loan servicer to a default collection servicer who is responsible for collections or rehabilitation of the loan.

3.     Due to the unique services and applicable regulations to each of these services, ED has contracted with private loan servicers and PCAs under individual procurements since the inception of the FDLP in 1992. *See* Higher Education Amendments of 1992, S. 1150, 102nd Cong. §§ 416(t), 428I(a)(1) (1992). Throughout the history of ED's direct loan program, these

services have been kept entirely separate with the sole interaction between servicers and PCAs being the referral of defaulted and rehabilitated[1] loans.

4.     Indeed, the unmistakable dichotomy between loan servicing and collections services is discussed at length in Office of Management and Budget Circular A-129 (the "OMB Circular"), which provides guidance to ED and other agencies on how to manage government receivables. Office of Mgmt. & Budget, Exec. Office of the President, Circular No. A-129, *Policies for Federal Credit Programs and Non-Tax Receivables* (Jan. 2013).  The OMB Circular indicates that Loan Servicing involves tasks including billing and recording payments, providing account information to credit reporting agencies, and maintaining loan documentation.  *Id.* at 15. Delinquent debt collection on the other hand involves monitoring delinquent borrowers such as through "skiptracing," issuing demand letters, wage garnishment, and other collections activities. *Id.* at 18-19.

5.     This dichotomy has been maintained for good reason, as the stringent regulations that apply to PCAs as "debt collectors" do not apply to loan servicers because the debts are not in default at the time they are received.  *See* 15 U.S.C. § 1692a(6)(F) (excluding from the definition of "debt collector," "any person collecting or attempting to collect any debt… which was not in default at the time it was obtained by such person").  Loan servicers take on these debt accounts before they are ever in default.

6.     On the other hand, Congress has imposed strict restrictions on the entities authorized to collect non-tax debts owed to the Federal Government.  The Debt Collections Improvement Act of 1996 ("DCIA"), 31 U.S.C. § 3701, *et seq.*, contemplates a private collections contractor

---

[1] When a student borrower and their assigned PCA agree to a collection plan and the borrower makes payments in accordance with that plan, the loan can be rehabilitated in which case it is referred back to a loan servicer.

engaging in collections activities but only if the debt is "referred" to it. *See* 31 U.S.C. § 3711(g)(4). Furthermore, contractor compensation for collections services are *statutorily mandated* to be on a contingency fee basis unless otherwise appropriated by Congress. *See* 31 U.S.C. § 3718(d)-(e).

7. Further, with these services being procured separately for nearly thirty years, contractors in both the loan servicing and PCA industries have necessarily become highly specialized. The unique requirements facing PCAs has resulted in contracts such as those awarded to small, agile businesses, like Plaintiff, who have a history of successful and compliant collections practices. Meanwhile, the contractors providing loan servicing have also become specialized to address the multitude of statutorily mandated payment methods, loan forgiveness programs, and other aspects unique to loans currently in good standing.

8. Quite clearly, these distinct industries not only operate under separate regulatory and legal regimes but also have produced highly specialized businesses with entirely different expertise, processes, and procedures.

## B. ED's Inability to Procure Debt Collection Services Lead the Agency to Pursue the Next Generation Financial Services Environment by Excluding PCAs

9. In 2014, after ED's contract with five small business PCAs and seventeen "unrestricted," large business PCAs for debt collection services ended, the agency issued a two-phase solicitation, pursuant to Education Federal Acquisition Regulations ("EDARS") § 3415.302-70(b), seeking follow-on PCAs. This approach called for ED to narrow the field of offerors following Phase I evaluations, cutting the field of offerors allowed to bid on Phase II. *Id.*

10. After ED awarded contracts to eleven small businesses and made its initial cut from the over forty large businesses that placed bids in the first phase of the solicitation, several protests were filed mainly challenging the Agency's selection criteria. *See, e.g., Northstar Location*

*Servs.*, B-409722.10, May 8, 2015, 2015 CPD ¶ 153; *Fin. Asset Mgmt. Sys. Inc.*, B-490722.9, Apr. 24, 2015, 2015 CPD ¶ 145.

11. After numerous delays and amendments, ED announced that it had completed Phase I and selected seven large companies as eligible to participate in Phase II of the solicitation to provide collections services. Again, ED's protracted procurement process led to more protests, and in the face of mounting scrutiny of the agency's ability to procure collections services, ED cancelled the solicitation.

12. In December 2015, ED issued its renewed attempt to procure collections services in the form of Solicitation No. ED-FSA-16-R-0009 (the "PCA Solicitation"). This time, ED sought to award several Indefinite Delivery/Indefinite Quantity ("IDIQ") contracts for collections services.

13. In December 2016, ED announced awards to seven offerors and, yet again, protests ensued. In a decision regarding several consolidated protests against the PCA Solicitation, the Government Accountability Office ("GAO") found that ED had failed to conduct reasonable evaluations of the offerors' past performance and recommended that the agency amend the PCA Solicitation to more accurately reflect the needs of the agency and re-evaluate the offers accordingly. *Gen. Revenue Corp.*, B-414220.2, *et al.*, Mar. 27, 2017, 2017 CPD ¶ 106.

14. In May 2017, in response to even more protests against the PCA Solicitation filed in this Court, ED filed a notice of corrective action noting that it would implement GAO's recommendations. *See Cont'l Servs. Grp., Inc. v. U.S.*, 722 Fed. Appx. 986, 992 (Fed. Cir. 2018). ED subsequently amended the PCA Solicitation several times yet none of these modifications altered the agency's evaluation methodology nor changed the stated requirements.

15. On August 4, 2017, during the course of ED's corrective reevaluation, FSA's Chief Business Operations Officer filed a sworn declaration to this Court explaining the distinction

between loan servicing and debt collection services. *See Automated Collection Servs. v. U.S.*, 133 Fed. Cl. 231, 233-34 (2017).

16.     Specifically, FSA's declaration explained that loan servicing involves the management of loans **which are not in default** and that such work is, "**separate and distinct from the debt collection work**," performed by PCAs. *Cont'l Servs. Grp., Inc. v. U.S.*, No. 17-449 *et al.*, Dkt. No. 183-2 at ¶ 6 (emphasis added).

17.     FSA also made reference to ED's August 1, 2017 press release[2] announcing NextGen. *Id.* at Exh. B.   This press release made no mention of debt collection services nor PCAs and strictly discussed modifications to ED's approach to loan servicing.   FSA confirmed as much, stating that the press release does not, "relate to the [PCA Solicitation] under which the [PCAs] will perform debt collection services.   As explained below, **the work to be performed under [the PCA Solicitation] is different from loan servicing, involving an entirely separate procurement effort**." *Id.* at ¶ 4 (emphasis added).

18.     Mere days after the resolution of the case in which this sworn declaration was filed, ED issued the NextGen Phase I request for proposals (the "NextGen RFP") on February 20, 2018. *See* Exhibit B.   The RFP made no reference to procurement of debt collection services.

19.     In fact, the NextGen RFP specifically carved out debt collection services, noting that PCAs would be involved in that stage of the student loan lifecycle.   *See* Exh. B at 6 (Depicting "Debt Management and Collection System" and PCAs as excluded from the services noted as the "focus for this solicitation.").   Accordingly, PCAs did not submit bids in response to the NextGen RFP and instead pursued the PCA Solicitation.

---

[2] Dept. of Educ., *Secretary DeVos Announces Intent to Enhance FSA's Next Generation Processing and Servicing Environment*, Aug. 1, 2017, online at https://www.ed.gov/news/press-releases/secretary-devos-announces-intent-enhance-fsas-next-generation-processing-and-servicing-environment.

20.    Concurrently, ED was mired in yet another string of protests related to new awards under the PCA Solicitation.  *See FMS Inv. Corp. v. U.S.*, 136 Fed. Cl. 439 (2018).  At issue in *FMS Inv. Corp.*, which was a consolidated case, was ED's actions in recalling loan accounts from PCAs providing debt collection services under the bridge contract extending the 2009 PCA task orders until award could be made under the PCA Solicitation.  *Id.*  at 442.  Disappointed offerors on the PCA Solicitation maintained that ED's evaluation and award decisions were arbitrary and capricious and sought an injunction against ED from making awards.  *Id.*  After this Court granted the protestors' injunction, ED represented that it would not continue to pursue litigation in support of the PCA Solicitation awards and would announce how it would proceed with the procurement on May 4, 2018.  *See FMS Inv. Corp. v. U.S.*, 139 Fed. Cl. 221, 224 (2018).

21.    Yet one day before this self-imposed deadline, ED announced that it would cancel the PCA Solicitation entirely because under the agency's "new vision," it would transition to utilizing "enhanced servicers" to administer delinquent loans "***through the resolution of any later default***," and as such the agency's need for PCA servicers "will diminish rapidly in the coming months and ***ultimately become non-existent***."  *Id.* (emphasis added).  The Government accordingly motioned to dismiss the protest as moot.  *Id.*

22.    In response, the protesters filed a separate action seeking to permanently enjoin the cancellation of the PCA Solicitation as arbitrary, irrational, and unsupported by documented agency findings.  *Id.*  Noting the cancellation notice as the first public announcement of ED's intention to use "enhanced servicers," as well as terming the administrative record ("AR") as "slipshod," and devoid of, "any plan or timeline for implementing the [enhanced servicer] program," the Court granted the permanent injunction and restored the PCA Solicitation on

September 14, 2018. *Id.* at 225-26. In a telling description of ED's arbitrary and severely disjointed string of procurement decisions around the NextGen initiative, the Court stated:

> The cancellation notice and the AR purport to outline a significant policy change. ***ED had clearly planned for PCAs to continue to administer defaulted student loans as recently as January 2018 because the agency awarded two PCA contracts that month. Yet not four months later, in a procurement cancellation notice, ED declared a new direction and an end to contracting for PCA services.*** ED needs to provide a 'reasoned analysis' for the policy change…. For all the reasons above, it has failed to do so. The AR before the court is not enough to show that ED's decision to cancel the solicitation was rational.

*Id.* at 226. (internal citations omitted) (emphasis added).

23.     Just ten days after the injunction was granted, ED announced the eleven offerors who had been selected under Phase I Solicitation to be eligible to compete for the three Phase II Solicitations: RFP No. 91003118R0023 for a "future state core platform" (Component C); RFP No. 91003118R0022 for "transitional core processing and related support activities" (Component D); and, RFP No. 91003118R0024 for "business process operations" (Components E & F) (collectively, the "Phase II Solicitations").

24.     Included among the Phase I awardees were several state government entities including Missouri Higher Education Loan Authority, Oklahoma Student Loan Authority, Pennsylvania Higher Education Assistance Agency ("PHEAA"), and Utah Higher Education Assistance Authority. *See* Solicitation No. 91003118R0024 attached hereto as <u>Exhibit C</u> at 49, § L.1.2.

25.     This is notable as at least one of these entities has argued that as a state entity, they are immune from suits seeking monetary damages under the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*, and other statutes regulating loan servicers. *See, e.g., Pele v. Pa. Higher Educ. Assistance Agency*, 628 Fed. Appx. 870 (4th Cir. 2015), *cert. denied*, 137 S. Ct. 617, 196 L. Ed. 2d 513 (2017) (rejecting PHEAA's argument that as an "arm" of the Commonwealth of

Pennsylvania, it enjoys immunity from a lawsuit under the Fair Credit Reporting Act pursuant to the Eleventh Amendment).

26.     Concurrent with this announcement, ED released the Phase II Solicitations and, shockingly, folded debt collection services into its terms despite the explicit carve out in Phase I. In addition to the typical loan servicing activities such as repayment plan processing, deferment and forbearance applications, specialty programs such as TEACH grants, Public Service Loan Forgiveness, etc., the Phase II Solicitations sought services including processing for rehabilitation, wage garnishment, and the treasury offset program.  *See* Exhibit B at 10, § C.3.3(b).

27.     It also sought contractors who could engage in common collections activities such as resolution of payment issues, "frequent outbound calls, early engagement for delinquent borrowers, skip tracing, etc." *Id.* at 9, § C.3.3(a).  Tellingly, only one of the eleven contractors selected in Phase I, Teleperformance, has ***any*** experience in debt collection services; however, that experience does not derive from any ED contracts servicing federal student loans.[3]

28.     Unsurprisingly, PCAs were incensed to discover that ED had slipped debt collection services into Phase II and some immediately filed protests at GAO alleging that ED had violated its own procurement regulations by failing to give notice to prospective offerors of the, "scope or purpose of the procurement that provides sufficient information for sources to make informed business decisions regarding whether to participate."  *See GC Servs. Ltd. P'ship*, B-416443, B-416443.2, Sept. 5, 2018, 2018 CPD ¶ 313 at 3 (citing 20 U.S.C. § 1018a(d)(2)); *See also Cont'l*

---

[3] *See* Stephanie Eidelman, *ED Moves NextGen Procurement to Phase II; Changes Rules of the Game*, insideARM (Oct. 3, 2018), https://insidearm.com/news/00044383-eds-nextgen-procurement-moves-phase-ii-el/.

*Serv. Grp., Inc., et al.*, B-416443.3, *et al.*, Nov. 19, 2018, 2018 CPD ¶ 393; *Navient Sols., LLC v. U.S.*, 141 Fed. Cl. 181 (2018).

29.    Specifically, the protestors argued that due to its failure to provide notice of its intent to procure debt collection services in the Phase I Solicitation, ED had acted arbitrarily and contrary to its own procurement regulations.  *See Navient*, 141 Fed. Cl. at 183.  Additionally, the protestors argued that ED had violated the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3551, *et seq.*, by impermissibly bundling loan servicing and default recovery services and, in so doing, created immitigable impaired organizational conflicts of interest.  *Cont'l Serv. Grp.*, B-416443.3 at 3.

30.    However, during the pendency of these proceedings, ED again agreed to institute corrective action, this time at the urging of this Court, by terminating the Phase I Solicitation awards, cancelling the Phase II Solicitations entirely, and reissuing the Phase I Solicitation. *Navient*, 141 Fed. Cl. at 183.  Although this Court agreed that ED had acted arbitrarily, "by adding PCA services to NextGen Phase II after downselecting the Phase I offerors," it ultimately denied the consolidated protests on the basis that ED had, "already agreed to take corrective action to address the Plaintiffs' allegations."  *Id.* at 184.

31.    ED implemented the corrective action on December 14, 2018.  Ostensibly in an attempt to avoid additional protests, ED abandoned its two-phase procurement strategy and allowed any interested offeror to submit bids under its next round of solicitations.

### C. The Solicitation

32.    On January 15, 2019, ED issued three solicitations, including Solicitation No. 91003119R0008 (NextGen Business Process Operations).

33.    Unfortunately, however, the Solicitation (No. 91003119R0008) is chock-full of problems as it unlawfully restricts small business competition by bundling distinct services into a single

procurement without regard for the mandated process to do so. This is not a new issue. ED was acutely aware of the challenges that plagued the Phase II Solicitations on the bases of improper bundling and creation of conflicts of interest, yet the Solicitation continues down that same path.

34. Particularly, the Solicitation seeks a contractor to provide services "across the entire life cycle of student financing (from application for financing, to origination and disbursement, to processing and servicing and pay-off or default)." Solicitation at 6 § C.3.1. In other words, the Solicitation bundles separate and distinct services for both loan servicing and collections services.

35. Indeed, ED repeatedly confirmed in the Solicitation and through Amendment 4 to the Solicitation that offerors were required to provide both default collections work and loan servicing. For example, in no fewer than four of the Agency's answers to questions from offerors, ED indicated that it expected offerors to provide services throughout the lifecycle of the loans, include those in default. Solicitation, Amendment 4 at 11, 18-19, Responses to Questions 92, 95, 168, and 170. ED even went so far as to state that, "[d]ifferentiations between FSA, servicers, and PCAs are indicative of the current state, not the NextGen Financial Services operating environment." *Id.* at 13, Response to Question 116. The Agency could not be clearer that bundling these requirements is an inherent aspect of the NextGen initiative.

36. For collections services, the Solicitation provides that one of ED's goals is to improve customer outcomes by "[d]ecrease[ing] [the] percentage of borrowers in delinquency or default[.]" Solicitation at 5. In this respect, part of the work that PCAs routinely perform involves rehabilitating defaulted borrowers—i.e., getting the borrower on track with making payments so that the account can be transferred back to the loan servicers to resume loan

servicing activities—by locating and establishing communications with the borrower to either enter into a voluntary payment plan or pursue collections proceedings.

37.     This aspect is highly regulated, as PCAs cannot harass borrowers with abusive or profane language, can only call during certain times of the day, cannot call repeatedly with the intent to annoy or harass the borrower, cannot contact friends, family or other third parties concerning the debt, and cannot engage in misleading communications such as threatening unauthorized legal action on behalf of the government. 15 U.S.C. § 1692c(a); 15 U.S.C. § 1692d(2), (5).

38.     In addition to collections services, the Solicitation makes clear that the contractor must also provide loan servicing activities. In that regard, the Solicitation provides that the contractor must "support efficient and effective operations, across the entire life cycle of student financing (from application for financing, to origination and disbursement, to *processing and servicing and pay-off* or default." Solicitation at 3 § C.1. (emphasis added).

39.     The Loan servicing called for in the Solicitation includes, "customer service; loan counseling; loan consolidation; billing and payment application and processing; repayment plan adjustments and application of benefits such as deferments, forbearance, or loan forgiveness/discharge; outreach and default aversion; quality control; and financial and other data reporting." *Id.* These tasks all involve support for the borrower to *avoid* default and are devoid of the adversarial nature of collections services. The distinction with collections services could not be clearer.

40.     Indeed, ED even recognized the distinct regulatory regimes that govern loan servicing and collections services by specifically drafting a tailor-made H clause, which provides that, "[t]he Contractor agrees that any payment of incentives for exceeding [a Service Level

Agreement] is conditioned on continued **compliance by the Contractor with all laws governing loan servicing and collection practices**." Solicitation at 23, § H-1 (emphasis added).

41.     In addition to bundling default collections work with loan servicing, the Solicitation also ostensibly provides for small business participation.    Solicitation at 61 § L-2.4.5.  The small business portion of the Solicitation requires that offerors submit Small Business Participation Plans ("SBPP") as part of an offeror's proposal.  *Id*.

42.     The Solicitation advises that offerors will be "contractually bound" to the terms of the SBPP and that an offeror will be ineligible for award if it fails to submit an acceptable SBPP.  *Id*. In that regard, the Solicitation notes ED's small business contracting goals of:

- Small Businesses – 32%;
- Women Owned Small Businesses 5%;
- Small Disadvantaged Businesses: 5%;
- Service Disabled Veteran Owned Small Businesses 3%; and
- Historically Underutilized Business Zones (HUBZones) 19%

Solicitation at 62 § L-2.4.5.

43.     Moreover, the Solicitation also cautions offerors that:

> Offerors are also **expected to increase their percentage of HUBZone utilization to 25% within two years after award, and to 30% within three years after award**. This may result in total small business subcontracting exceeding 32%. Offerors are strongly encouraged to exceed the cited goals. The plan will be reviewed for compliance with FAR 19.705-4.

*Id*. (emphasis added).

## IV.    ARGUMENT

### A. Jurisdiction, Standing And Standard Of Review

#### 1.   The Court Has Jurisdiction Over This Matter

Pursuant to the Tucker Act, this Court has jurisdiction "to render judgment on an action by an interested party objecting to… the award of a contract or any alleged violation of statute or

regulation in connection with a procurement." *See* 28 U.S.C. § 1491(b)(1); *see also Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009); *see also Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 527 (2010) (summarizing the three categories of "bid protest" jurisdiction authorized by 28 U.S.C. § 1491(b)(1)).

The United States Court of Appeals for the Federal Circuit ("Federal Circuit") has interpreted the term "procurement" broadly in this context. *See K-Lak Corp. v. U.S.*, 93 Fed. Cl. 749, 753-54 (2010). Specifically, at Court has held that for purposes of determining jurisdiction under Section 1491(b)(1), "procurement" includes "all stages of the process of acquiring property or services, beginning with the process for determining ta need for property or services and ending with contract completion and closeout." *Id.* (citing *Distributed Sols. v. U.S.*, 539 F.3d 1340, 1345 (Fed. Cir. 2008)). Indeed, the term "in connection with a proposed procurement," by definition, "involves a connection with any stage of the federal contracting acquisition process." *Google, Inc. v. U.S.*, 95 Fed. Cl. 661, 672 (2011) (citing *Distributed Sols.*, 539 F.3d at 1346). Similarly, the Federal Circuit has held that as long as a "statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction." *K-Lak Corp.*, 93 Fed. Cl. at 753-54 (citing *RAMCOR Servs. Grp., Inc. v. U.S.*, 185 F.3d 1286, 1289 (Fed. Cir. 1999)).

Here, the gravamen of Plaintiff's complaint is that ED, by choosing to (1) improperly and unjustifiably bundle loan servicing and default collection services without regard for the procedural requirements to do so, and (2) unduly restrict small business prime participation in the agency's defaulted student debt collections efforts, violated the Competition in Contracting Act ("CICA"), 41 U.S.C. § 3304 *et seq.*, as well as the FAR, acted in an arbitrary and capricious manner, abused its discretion and otherwise acted contrary to law. The allegations at issue in this

litigation, therefore, involve the federal contracting acquisition process, and relate to the violation of statutes connected to procurement. As such, this Court has jurisdiction over this case.

## 2. EPM Has Standing To File This Protest

As a threshold matter, a plaintiff contesting the award of a federal contract must establish that it is an "interested party" in order to have standing under 28 U.S.C. § 1491(b)(1). *Google*, 95 Fed. Cl. at 673. The Federal Circuit has construed the term "interested party" in 28 U.S.C. § 1491(b)(1) to be synonymous with "interested party" as defined by CICA, 31 U.S.C. § 3551(2)(A). *Id.* (internal citations omitted). Typically, to establish standing as an "interest party," "a protestor must show that: (1) it was an actual or prospective bidder or offeror, and (2) it has a direct economic interest in the procurement or proposed procurement." *Id.* (internal citations omitted).

In the context of a pre-award protest, to satisfy the "direct economic interest" prong and therefore be an "interested party" under the Tucker Act with standing to sue, the Federal Circuit has held that a protestor must have suffered a "non-trivial competitive injury which can be redressed by judicial relief." *See Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (quoting *Weeks Marine*, 575 F.3d at 1362–63). However, where a claim is made that an agency violated the CICA, "it is sufficient for standing purposes if the plaintiff shows that it likely would have competed for the contract had the government publicly invited bids or requested proposals." *Id.* (citing *CCL, Inc. v. U.S.*, 39 Fed. Cl. 780, 790 (1997); *see also Glob. Comput. Enters., Inc. v. U.S.*, 88 Fed. Cl. 350, 418-19 (2009) (holding that, under the Tucker Act, a plaintiff was an interested party where it would have submitted an offer if a competitive solicitation had issued.).

To have standing, a protestor must also show that the alleged errors in the procurement were prejudicial.  *Labatt Food Serv., Inc. v. U.S.*, 577 F.3d 1375, 1378 (Fed. Cir. 2009) ("It is basic that because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.") (quotations and citations omitted).  This Court has recognized that "deprivation of an ***opportunity to compete*** is sufficient economic harm to demonstrate prejudice for purposes of standing."  *Magnum Opus,* 94 Fed. Cl. at 533 (2010) (emphasis added); *see also Rex Servs. Corp. v. U.S.*, 448 F.3d 135, 1308 n.1 (2006) (indicating that protestor may have standing if, "improper agency action" prevents the offeror from submitting a bid or protesting the solicitation).

Here, EPM is a small, disadvantaged and service-disabled veteran-owned small business that provides the type of defaulted student debt collection services called for by Solicitation calls for in addition to its loan servicing deliverables.  Had ED acted in accordance with CICA and the FAR by issuing separate solicitations for loan servicing and debt collection services, EPM certainly would have been able to compete, and likely would have competed, for the debt collection services solicitation.  Alternatively, ED could have acted in accordance with CICA and the FAR by issuing a partial set-aside at least for the debt collection portion of the NextGen Procurement, in which case EPM certainly would have been able to complete for such a set-aside.  Instead ED chose to improperly bundle these two distinct services for the purpose of administrative convenience and political expediency.

While ED may have pursued bundling these services in accordance with FAR Part 7,[4] the agency instead sought to curtail the potentially lengthy process of working with the Small

---

[4] FAR Part 7 requires several key steps during the acquisition planning stage of any procurement which may constitute bundling of distinct services.  FAR § 7.105 requires that the agency's acquisition plan include

Business Administration ("SBA") and incumbent small business contractors to consolidate the services according to procurement law and regulations. This could have provided Plaintiff and other small business PCAs with the notice and resources contemplated by the Small Business Act to address the impact that *reasonable* and *justified* bundling have on small business procurement programs. Instead, ED neglected these procedures in favor of pushing forward to achieve the NextGen goals without regard for small business prime contractor participation.

Therefore, improper and unlawful agency action deprived EPM of the opportunity to compete as a prime contractor for the agency's procurement of debt collection services. As such, EPM was prejudiced by the agency's procurement error, and has standing to file this protest.

### 3. Legal Standards Concerning Agency Action Under APA

This Court reviews challenges to agency decisions pursuant to the Administrative Procedures Act ("APA," 5 U.S.C. § 706). 28 U.S.C. § 1491(b)(4). *Google*, 95 Fed. Cl. at 675; *see also Axiom Res. Mgmt., Inc. v. U.S.*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. U.S.*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) ("Bid protest cases are reviewed under the standard set forth in the Administrative Procedures Act."). The APA provides that:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and

---

consideration of the impact the bundling will have on small business prime participation, incumbent small business contractors affected by the bundling, and address market research related to the intention to bundle the services.

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C § 706. Therefore, pursuant to the APA, an agency's procurement decisions will be upheld unless shown to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See, e.g., Ceres Envtl. Servs., Inc. v. U.S.*, 52 Fed. Cl. 23, 33 (2002) (citing 5 U.S.C. § 706(2)(A); 28 U.S.C. § 1491(b)(4)). In other words, a plaintiff must show either that there was no "rational basis" for the agency decision, *or* that there was "a clear and prejudicial violation of applicable statutes or regulations." *Id.* (citing *Impresa*, 238 F.3d at 1332; *Advanced Data Concepts, Inc. v. U.S.*, 216 F.3d 1054, 1057 (Fed. Cir. 2000)); *Elec. Data Sys., LLC v. U.S.*, 93 Fed. Cl. 416 429 (Fed Cl. 2010) (internal citations omitted).

As laid out in detail by Judge Braden in the *Google* decision, the Court must perform a three-step analysis when reviewing alleged agency violations pursuant to the APA: (1) "The [C]ourt's primary responsibility is to determine whether the agency violated a federal statute or regulation in the procurement process and whether any such violation was prejudicial"; (2) [i]f no prejudicial violation of law or regulation is found, the[C]ourt is next required to determine whether the agency decision evidences a rational basis"; and (3) [l]ast, the [C]ourt is required to

ascertain whether the agency *otherwise* acted in an arbitrary and capricious manner with respect to the procurement at issue." *Google*, 95 Fed. Cl. at 675 (internal citations omitted) (emphasis in original). In other words, the Court may find an agency action improper if it fits in any one of the listed categories.

Therefore, to prevail on this protest, EPM must show only that ED's actions were ***any one*** of the following: a violation of applicable statutes or regulations; contrary to a Constitutional right, power, privilege, or immunity; agency action which is arbitrary, capricious or an abuse of discretion; agency action otherwise not in accordance with law; ***or*** agency action lacking a rational basis. As laid out below, ED's actions fall under ***all*** of these categories.

### 4. Legal Standard Concerning Criteria For Injunctive Relief

In order to obtain temporary injunctive relief, Plaintiff must demonstrate:

(a) substantial probability that the Plaintiff will prevail on the merits;
(b) irreparable harm to the Plaintiff unless the injunction is granted;
(c) absence of substantial harm to other interested parties or that the balance of equities tips in its favor; and
(d) absence of harm to the public interest.

*Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, 660 F.3d 1293, 1295 (Fed. Cir. 2011) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *Amoco Prod. Co. v. Vill. Of Gambell*, 480 U.S. 531, 549 n.12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)). However, the evidence presented for each of these criteria is balanced by the court on a sliding scale basis. A much stronger showing on one or more of the necessary factors lessens the amount of proof required for the remaining factors. *Washington Metro. Area Transit Auth. v. Holiday Inn.*, 559 F.2d 841 (D.C. Cir. 1972). No one factor is dispositive, and "the weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp. v. U.S.*, 3 F.3d 424, 427 (Fed. Cir. 1993).

Below, Plaintiff addresses the four-factors enumerated above in light of the facts at issue in this case. For the reasons set forth below, Plaintiff submits that it is entitled to the relief sought.

## B. Plaintiff is Entitled to Injunctive Relief

### 1. Plaintiff is Likely to Succeed on the Merits of The Counts Pled in the Complaint Because ED's Actions Constituted a Violation of Established Law, were Unduly Restrictive on Competition, were Lacking in the Procedure(s) Required by Law, were Arbitrary and Capricious, and Lacked any Rational Basis

In considering whether to grant interim injunctive relief pending a final decision on the merits, the Court of Federal Claims has consistently held that the "likelihood of success" is a flexible factor and does not require a certain "mathematical probability." *Magellan Corp. v. U.S.*, 27 Fed. Cl. 446 (1993); *TRW Envtl. Safety Sys., Inc. v. U.S.*, 16 Cl. Ct. 516 (1989). This Court has further held that it is sufficient if the Plaintiff can demonstrate either (1) "a combination of probable success in the merits and the possibility of irreparable injury," or (2) "that series questions are raised and the balance of hardships tips sharply in favor" of the plaintiff. *Id.* at 527. As demonstrated below, Plaintiff's request for preliminary injunctive relief meets these standards.

#### a. *ED's Actions Constituted a Violation of Established Law, Including, but not Limited to, CICA and the FAR, and were Unduly Restrictive of Competition*

Under the CICA, the government must procure goods and services in such a way as to "achieve full and open competition." 41 U.S.C. § 3301. Pursuant to CICA, agencies must solicit proposals from potential awardees in accordance with FAR Parts 7 and 15.[5] However, ED failed

---

[5] Although an agency also may fulfill its CICA requirements by following the procedures outlined at FAR § 8.401 *et seq.*, that section only applies to "required sources of supplies and services" which do not include the services sought under the Solicitation.

to follow the procedures set forth at *either* FAR Parts 7 and 15, nor did it follow the procedures of FAR § 8.401. Indeed, ED, at the unnecessary expense of small business participation in the federal student loan programs, arbitrarily chose to improperly bundle two distinct services for the sake of administrative convenience and political expediency.

This Court has held that "bundling" occurs where a solicitation, "(1) consolidate[s] two or more requirements that were previously procured under separate smaller contracts into a single contract, and (2) [is] likely [to] be unsuitable for award to a small business." *CHE Consulting, Inc. v. U.S.*, 125 Fed. Cl. 234, 245 (2016) (quoting *Benchmade Knife Co. v. U.S.*, Fed. Cl. 731, 739 (2007)); *see also* FAR § 2.101. However, bundling is only violative of the FAR and CICA where it is "unnecessary and unjustified." *Tyler Constr. Grp. v. U.S.*, 570 F.3d 1329, 1335 (Fed. Cir. 2009). Agencies bear the burden of conducting *extensive* market research and taking other procedural steps during acquisition planning to establish that consolidating procurement requirements is "necessary and justified." *Id.* Accordingly, FAR Part 7 establishes the procedures which agencies must follow when considering consolidation or bundling of two or more distinct services.

Specifically, FAR § 7.105 requires that the acquisition plan: include a consideration of the impact of bundling on small business participation; include a list identifying incumbent contractors and contracts affected by the bundling; and address the results of market research as it relates to the intention to bundle such services. FAR § 7.105(b). Where the agency is considering, "substantial bundling," which for ED procurements means bundling resulting in a contract with an estimated value in excess of $2.5 million, the agency must document:

(1) The specific benefits anticipated to be derived from substantial bundling;

(2) An assessment of the specific impediments to participation by small business concerns as contractors that result from substantial bundling;

(3) Actions designed to maximize small business participation as contractors, including provisions that encourage small business teaming;

(4) Actions designed to maximize small business participation as subcontractors (including suppliers) at any tier under the contract, or order, that may be awarded to meet the requirements;

(5) The determination that the anticipated benefits of the proposed bundled contract or order justify its use; and

(6) Alternative strategies that would reduce or minimize the scope of the bundling, and the rationale for not choosing those alternatives.

FAR § 7.107-4(b). The agency also must publish a notice on a public website including a justification which includes:

(A) The specific benefits anticipated to be derived from the bundling of contract requirements and a determination that such benefits justify the bundling.

(B) An identification of any alternative contracting approaches that would involve a lesser degree of bundling of contract requirements.

(C) An assessment of—

(i) the specific impediments to participation by small business concerns as prime contractors that result from the bundling of contract requirements; and

(ii) the specific actions designed to maximize participation of small business concerns as subcontractors (including suppliers) at various tiers under the contract or contracts that are awarded to meet the requirements.

15 U.S.C. § 644(e)(3).

Furthermore, to justify bundling, the agency must establish that it would obtain, "***measurably substantial benefits*** as compared to meeting its… requirements through separate smaller contracts." FAR § 7.107-3 (emphasis added). While a decrease in administrative costs can support a finding that the benefits meet this threshold, the anticipated financial benefits must be equivalent to, "[t]en percent of the estimated contract or order value (including options) if the value is $94 million or less; or [f]ive percent of the estimated contract or order value (including

options) or $9.4 million, whichever is greater, if the value exceeds $94 million."  FAR § 7.107-3(d).

Additionally, ED is required to notify the incumbent small business concerns who may be affected by the intention to bundle distinct services and refer them to a local Small Business Administrative procurement center representative.  FAR § 10.001(c)(2).  Once the acquisition planning stage has been completed, the agency must issue notifications to (a) current small business contractors, (b) to the U.S. Small Business Administration ("SBA") regarding the savings and benefits of follow-on requirements that have been bundled, and (c) the public notification on its website as discussed above.  FAR § 7.107-5.  Such notices must be provided at least 30 days prior to the issuance of the solicitation for the bundled requirement.  *Id.*

Yet even prior to considering "bundling," agencies must partially set aside a contract exclusively for small business participation where:

> (1) A total set-aside is not appropriate [];
>
> (2) The requirement is severable into two or more economic production runs or reasonable lots;
>
> (3) One or more small business concerns are expected to have the technical competence and productive capacity to satisfy the set-aside portion of the requirement at a fair market price;
>
> (4) The acquisition is not subject to simplified acquisition procedures; and
>
> (5) A partial set-aside shall not be made if there is a reasonable expectation that only two concerns (one large and one small) with capability will respond with offers unless authorized by the head of a contracting activity on a case-by-case basis. Similarly, a class of acquisitions, not including construction, may be partially set aside. Under certain specified conditions, partial set-asides may be used in conjunction with multiyear contracting procedures.

FAR § 19.502-3(a).  ED's actions in seeking to push small business PCAs out of the federal student loan industry and consolidate loan servicing and collections services quite clearly

constitutes improper and unjustified bundling. It is neither necessary nor prudent for ED to take such action. First, ED failed to implement a partial set-aside of the requirements exclusively for small business participation, as the requirements of the Solicitation could be separated into two or more reasonable lots, as it had been separated for years. Second, ED failed to undertake any of the procedural requirements to justify bundling the loan servicing with the debt collection. Finally, and most importantly, any such process would be fundamentally flawed as there is no justification for bundling these two requirements, and in fact, such a combination runs counter to Congressional policy and statutory mandates.

The distinction between loan servicing and default collections services was recognized even by ED in the Phase I Solicitation which expressly shows the clear separation between loan servicers who engage with borrowers throughout the administration of the loan and defaulted loan collection services provided by PCAs after the loan enters default. *See* Exhibit A at 6. Thus, even ED has recognized that bundling these services is neither justified nor necessary because the agency had no intention of doing so as recently as September 2018. Moreover, ED has failed entirely to take any of the procedural steps required for bundling these distinct services. EPM has been advised that ED has not issued any notices to incumbent small business contractors, ED failed to post any notice or justification of its intent to bundle these services on a public website, and to the extent ED performed any reasonable analysis during acquisition planning on the impact to small businesses, it has not taken the necessary next step of communicating its findings with incumbents nor SBA.

Furthermore, the ED's decision runs counter to Congressional policy and statutory mandates. For example, Congress has encouraged ED to contract with PCAs in accordance with ED's legislative mandate to, "try to collect [funds owed on account of loans made by] the United

States Government… arising out of the activities of… the agency." 31 U.S.C. § 3711(a)(1); *see also* 31 U.S.C. § 3718(a) ("Under conditions the head of an executive… agency considers appropriate, the head of the agency may enter into a contract… for collection service[s] to recover indebtedness owed [to] the United States Government.").

Finally, loan servicing and private debt collection services are completely distinct and subject to entirely different regulatory regimes and funding mechanisms. As is the case with most federal contracts, funding for loan servicing is derived from congressional appropriations. *See, e.g.,* H.R. Rep. No. 115-862 at 149 (establishing annual appropriation for "loan servicing activities" under the Student Aid Administration). Contracted PCAs on the other hand are *statutorily mandated* to receive compensation via a contingency fee based on the amount recovered from defaulted borrowers. *See* 31 U.S.C. § 3718(d)-(e). Even from a policy perspective, ED's decision to bundle the Solicitation is entirely flawed. For example, to have a single entity[6] responsible for both loan servicing and private debt collection services creates an unmitigable impaired objectivity conflict of interest[7] in part because of the differing funding mechanisms for these services. Where a single entity undertakes both services with regard to the same loan, it would have a natural and unmitigable incentive to shift work to the service that results in the highest returns for the contractor.

In short, under the Solicitation, ED has engaged in unnecessary and unjustified bundling at the expense of small business participation in the federal student loan marketplace and to the extent that the agency's bundling action was justified, it nevertheless has failed to adhere to the

---

[6] Amendment No. 91003119R00050002 includes a response to an offeror indicating, "FSA intends to make one award for the Enhanced Processing Solution."

[7] Such a conflict of interest exists where a firm's ability to render impartial advice to the government is undermined by competing interests such as a relationship to the service being evaluated. FAR § 9.505-3.

procedural requirements authorizing such action under the FAR. ED's actions violated the statutory requirements regarding "full and open competition through the use of competitive procedures," and as such has violated CICA and the FAR.

### b. ED's Conduct was Arbitrary and Capricious, Lacked any Rational Basis, and was an Abuse of Discretion

In bid protest actions such as this one, the Courts shall review the agency's decision pursuant to the standards set forth in the APA. 28 U.S.C. § 1491(b)(4). As set forth above, the APA provides that the action of each authority of the Government of the United States, including ED, is subject to judicial review except where there is a statutory prohibition on review or where agency action is committed to agency discretion by law. In this case, there is no indication that Congress sought to prohibit or restrict judicial review of ED actions such as those at issue here.

Pursuant to the APA, 5 U.S.C. § 706, "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(b) contrary to constitutional right, power, privilege, or immunity;

(c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(d) without observance of procedure required by law;

(e) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

> (f) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C § 706.  As set forth above, ED's conduct, *inter alia*: constituted a violation of CICA and FAR; lacked the observance of procedure required by law; was arbitrary and capricious; constituted an abuse of discretion; and was otherwise not in accordance with law.  ED has not set forth a reasonable justification for its actions in bundling these requirements and as such has failed to meet its requirements under the APA to conduct either the Solicitation, or the NextGen initiative generally, in a manner consistent with federal law on administrative procedure.

As such, this Court should set aside as unlawful ED's Solicitation that improperly bundles loan servicing and default collections services at the expense of small business prime contractor participation and enjoin ED from making any awards thereunder until ED complies with applicable law and regulation.

### 2. **EPM will be Irreparably Harmed if Injunctive Relief is Not Issued**

If EPM is not given a chance to compete for the debt collection services portion of the NextGen Procurement it will suffer irreparable harm.  As a small, disadvantaged service-disabled, veteran-owned small business providing default collections services, EPM is ready and able to provide the exact debt collection services sought by ED.  However, small businesses, such as EPM, do not have the capability to provide the services for the entire "lifecycle" of a loan as currently required by the Solicitation. By bundling all of the other "lifecycle" services with the debt collection services into one solicitation, ED is eliminating small businesses from the competition.  EPM is entitled to compete for the debt collection services ED seeks to procure under the NextGen Procurement because ED was required either to procure such services in a separate solicitation from that seeking loan servicers or to set-aside such services pursuant to 48 C.F.R. § 19.502-3.  By choosing not to take one of these actions and unnecessarily bundling

these two distinct services such that small businesses could not participate, ED has violated CICA and the FAR.

Absent injunctive relief, EPM, and **all** other small business PCAs, will be completely and irreparably, precluded from participating as prime contractors in federal student loan servicing **in perpetuity**. Based on ED's arbitrary decision to consolidate these default collection services with loan servicing, EPM and the entire student loan PCA industry will be decimated. Indeed, considering that private debt collection services for ED constitutes a necessary revenue stream for EPM to continue as a going concern, and undoubtedly other PCAs, could even go out of business prior to the end of this litigation. Monetary loss which threatens the very existence of a concern's business constitutes irreparable harm sufficient to establish entitlement to injunctive relief. *See, e.g., Wis. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985).

At best, even if EPM manages to stay in operation during the pendency of this litigation, EPM will have lost a significant amount of staff as a result of down-sizing required due to the lack of incoming revenue. For this reason, the "dumping" of a massive amount of accounts following the successful resolution of this litigation will not make EPM whole. If EPM is still operating at that time, it will, as set forth above, be short-staffed; therefore, it will be unable to handle a massive amount of new account placements at once. In fact, a massive influx of accounts will only further damage EPM. Its inability to service all of the new accounts at one time will further deprive EPM of the revenue it would have received had the accounts been transferred to EPM evenly overtime and in accordance with the current PCA contract. Moreover, in addition to the issues regarding new accounts, EPM will have lost the accounts that would be further along in the collection "pipeline."

In short, EPM will suffer irreparable harm if ED is not enjoined from awarding the NextGen Procurement to "enhanced servicers" pending the outcome of this litigation.

### 3.   No other Party Will Suffer Irreparable Harm if Injunctive Relief is Issued

This Court must consider whether the issuance of injunctive relief to the movant will substantially injure the other parties in the proceeding.  *Ceres Envtl.*, 52 Fed. Cl. at 38 (internal citations omitted).  As discussed above, if Plaintiff's request for injunctive relief is not granted, it will suffer great and irreparable harm.  This outweighs any potential harm to ED.

As noted in the Court's General Order No. 38, the "Court's practice is to expedite protest cases to the greatest practical extent," and Plaintiff is prepared to agree to an expedited schedule for resolving this matter.  *See* 28 U.S.C. § 1491(b)(3) ("[i]n exercising jurisdiction under this subsection, the courts shall give due regard to… the need for expeditious resolution of the action.").  Given the Court's practice to expedite bid protests, it is unlikely that ED will suffer irreparable injury during the pendency of this litigation.

There is no reason to believe that the NextGen Procurement is an emergency procurement, or that ED would therefore be adversely impacted if the issuance of the award(s) under the Solicitation is delayed for a limited amount of time.  Moreover, any delays to the implementation of the NextGen Procurement are a direct result of ED's improper conduct, as outlined above.  ED chose to act arbitrarily, capriciously, and without a rational basis.  ED has abused its discretion and has shown that it has prioritized administrative convenience and political expediency over small business involvement in its procurement of student loan servicing and debt collection activities.  Thus, to the extent that there is any burden to be borne, ED should be the party to bear it.  *See, e.g., PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003) (finding that harm caused to the Government by inconvenience or a delay in performance

is generally less significant than the harm caused to a bid protestor if the protest is ultimately sustained).

### 4. __Public Interest Favors the Issuance of an Injunction__

Generally, the public interest is served by ensuring fair and open competition in the procurement process. *Cincom Sys. v. U.S.*, 37 Fed. Cl. 266, 269 (1997) (citing *Magellan*, 27 Fed. Cl. at 448). Moreover, it is a well-settled principle that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring the Government to follow its procurement statutes and regulations. *CW Gov't Travel, Inc. v. U.S.*, 61 Fed. Cl. 559, 576 (2004) (citing *United Int'l Investigative Servs., Inc., v. U.S.*, 41 Fed. Cl. 312, 323 (1998)) (holding that the "public has a strong interest in preserving the integrity of the procurement process."). Additionally, this Court has acknowledged that the public interest is served by, "fostering increased small business participation," in federal procurement. *Weeks Marine*, 79 Fed. Cl. at 37. The public interest is always served when the procurement procedures required by law and regulation are followed.

Moreover, the public interest is served by the prohibition of executive overreach and the overstepping of public authority such as demonstrated by ED in this case. As discussed above, Congressional mandates regarding the differing regulatory regimes affecting loan servicers and PCAs render the deliverables under the Solicitation in conflict with state and federal law. Further, the bundling will result in decreased oversight of loan servicers and PCAs at the expense of borrowers and taxpayers.

Finally, ED's strong push towards quickly implementing the NextGen initiative may, in the agency's estimation, result in a more convenient procurement mechanism from the perspective of administrative convenience. However, this Court has long recognized that the public interest, "is not well-served when contracting officials rush to save a few weeks and end

up delaying contracts by many months," or in this case years.  *Univ. Research Co. v. United States*, 65 Fed. Cl. 500, 515 (2005).

As set forth above, ED has acted arbitrarily and capriciously, abused its discretion, violated the law, and infringed upon the rights of small businesses such as EPM to participate in the federal procurement process.  In doing so, ED impermissibly interfered with EPM's ability to do business, and to reap the benefits associated with its continued contractual relationship with the agency to provide PCA services.  Issuance of an injunction will thus serve the public interest by protecting the integrity of the competitive procurement process.  Moreover, considering the significant conflict of interest created by the Solicitation, whereas one contractor would be responsible for both the servicing of a loan and collecting on that same loan if it goes to default, moving forward with the Solicitation as written could have disastrous effects to the Federal Government and the American taxpayer. Thus, it is in the public interest for the Court to issue injunctive relief.

## V.    CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that its application for temporary restraining order, and motion for preliminary injunction be granted, and that the Court enjoin ED from making any awards under the Solicitation until this Court renders a final decision on the merits.    Plaintiff further requests that this Court grant such other relief as it deems appropriate.

Respectfully submitted,

**MATROSS EDWARDS, LLC**


_/s/ *Joshua B. Duvall*_____

Dated:   July 16, 2019                                      Joshua B. Duvall
                                                           Matross Edwards LLC

1717 K Street NW, Suite 900
Washington, DC 20006
202.854.9959
jduvall@matrossedwards.com

*Attorney of Record for*
*Emergency Planning Management Inc.*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was filed electronically via the

CM/ECF system on this 16th day of July, 2019.

*/s/ Joshua B. Duvall*

Joshua B. Duvall